In re BOSTON HERALD,
INC., Petitioner.

United States,

v.

John J. Connolly, Jr., Defendant,
Appellee.

Boston Herald, Inc. Intervenor,
Appellant.

Nos. 02–2340, 02–2098.

United States Court of Appeals,
First Circuit.

Heard Dec. 12, 2002.

Decided: Feb. 25, 2003.

Elizabeth A. Ritvo with whom M. Robert Dushman, Jeffrey P. Hermes, and Brown Rudnick Berlack Israels LLP were on brief for petitioner-appellant.

Andrew Nathanson with whom Tracy A. Miner, John J. Tangney, Jr., and Mintz Levin Cohn Ferris Glovsky and Popeo, P.C. were on brief for respondent-appellee (John J. Connolly, Jr.).

Before LYNCH, LIPEZ, and HOWARD, Circuit Judges.

LYNCH, Circuit Judge.

John J. Connolly, Jr., the defendant in a highly publicized criminal trial, applied under the Criminal Justice Act (CJA), 18 U.S.C. § 3006A (2000), for government funding for a portion of his attorneys' fees and legal expenses. Connolly had informed the court that he was already in debt to the counsel he had previously retained, and could no longer afford to pay his legal bills. He submitted financial affidavits and an additional document summarizing his total legal debt. The court granted him CJA assistance and, in response to his motions, placed the documents he had submitted under seal. After Connolly's conviction, the Boston Herald, one of Boston's two major daily newspapers, sought to intervene in the case and to unseal these financial documents, arguing

that it had a right of access to them under both the First Amendment and the common law. Connolly opposed. A magistrate judge allowed the intervention but denied the motion to unseal, and the district court affirmed. The Herald then filed both an interlocutory appeal and a petition for a writ of mandamus with this court.

No federal court of appeals, to our knowledge, has considered whether there is a right of access to the narrow category of documents at issue here: those submitted by a criminal defendant to show financial eligibility for CJA funds. We conclude that there is no right of access to this category of documents under either the First Amendment or the common law. Even if there were a common law presumption of access, there was no abuse of discretion in denying access here. We affirm the district court and deny mandamus.

## I.

Connolly is a former FBI agent who was accused of impropriety in his relationships with informants, including alleged organized crime figures such as James "Whitey" Bulger and Stephen Flemmi. More detail about the earlier chapters of this saga can be found in *United States v. Flemmi*, 225 F.3d 78 (1st Cir.2000); *United States v. Salemme*, 91 F.Supp.2d 141 (D.Mass.1999); and *United States v. Salemme*, 978 F.Supp. 343 (D.Mass.1997). Information about Connolly's relationships was extracted from a reluctant government by a persistent trial judge who heard the earlier criminal cases. Connolly's prosecution and trial garnered extensive media coverage and public interest nationwide, especially in the Boston area, where he had been employed by the FBI. On May 28, 2002, Connolly was convicted of racketeering and obstruction of justice in the U.S. District Court for the District of Massachusetts. He has appealed his conviction, and that appeal remains pending separately.

At a pretrial hearing on March 5, 2002, Connolly's attorney informed the district court that Connolly owed defense counsel substantial unpaid legal fees. The court noted that, with a trial in the complex case due to begin only two months later, substitution of counsel was not feasible. To avoid delay, the court raised the possibility that the attorney could be appointed and paid under the CJA if Connolly could demonstrate his eligibility. The CJA applies to "any person [who is] financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a).

Two days later, Connolly submitted an application for CJA assistance to the court's Office of Pre–Trial Services. The application was referred to a magistrate judge, who appointed Connolly's lawyer under the CJA in a written order on March 11, stating, "[I]t appears that although the defendant possesses a number of substantial assets, the total of these assets is less than half of his current liabilities." Most of these liabilities, the order said, were legal bills that Connolly had already incurred. The order limited funding to cover only legal services provided after March 5, when counsel first informed the court of Connolly's financial problems, and it recommended that the court re-evaluate Connolly's eligibility at the close of the case. The compensation rate for CJA-appointed counsel is significantly below the prevailing private rates for attorneys in Boston. As of May 1, 2002, shortly before Connolly's trial began, it was $90 an hour, and before then it was $75 an hour for in-court work and $55 an hour for work performed outside court. There is a waivable maximum total of $5,200 per lawyer for a felony case. *See* 18 U.S.C.A. §§ 3006A(d)(2)-(3) (West Supp.2002).

The magistrate judge also granted Connolly's motions to seal three documents that he had submitted to demonstrate his CJA eligibility. The orders to seal these documents were issued without written findings; there was no objection to them at that time. Two of the three sealed documents are an original and an amended version of Connolly's completed CJA Form 23 (the "CJA forms"), a standard "financial affidavit" signed under penalty of perjury. A blank copy of Form 23 is appended to this opinion. It requires comprehensive financial data, including employment income of the defendant and his or her spouse; all other income, cash, and property; identification of the defendant's dependents; and all obligations, debts, and monthly bills. The third document, submitted in response to a question from the magistrate judge, states the total of Connolly's outstanding legal fees from the date of his indictment, December 22, 1999, through February 28, 2002. The magistrate judge's written order appointing Connolly's lawyer under the CJA has always remained public.

On June 7, 2002, shortly after Connolly's conviction, the Herald filed a motion to intervene and to vacate the orders sealing the three documents. Connolly opposed the motion. The district court referred the matter to the same magistrate judge, who allowed the Herald to intervene. In a written order of June 24, 2002 he denied the Herald's motion to vacate the sealing order. *United States v. Connolly*, 206 F.Supp.2d 187, 188 (D.Mass.2002). On July 29, 2002, the district court overruled the Herald's objections to the magistrate judge's order.

## II.

### A. *Appellate Jurisdiction*

█ A federal court must satisfy itself of its jurisdiction over a case, even if all parties urge there is jurisdiction. *See BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers*, 132 F.3d 824, 828 (1st Cir.1997). To be sure of receiving prompt review, the Herald prudently made its request for access through two different procedural means, each raising the same substantive issues. On August 19, 2002, the Herald filed an interlocutory appeal from the district court's July 29 order; on October 21, it filed a petition for a writ of mandamus. We ordered the two cases consolidated and received briefing and oral argument from the Herald and Connolly.

█ An appeals court may exercise its power of advisory mandamus under the All Writs Act, 28 U.S.C. § 1651 (2000), when a petition "presents an issue of great importance and novelty, and one the resolution of which will likely aid other jurists, parties, and lawyers." *In re Justices of Superior Court Dep't of Mass. Trial Court*, 218 F.3d 11, 15 (1st Cir.2000). This court has found advisory type of mandamus power present in at least two cases arising from similar procedural settings, where media outlets challenged limitations placed on their access to a proceeding or document by a district court. *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir.2002); *United States v. Hurley* (*In Re Globe Newspaper Co.*), 920 F.2d 88, 90 (1st Cir. 1990). The conditions for mandamus review are similarly satisfied here.

█ The Herald also argues that we have jurisdiction over its interlocutory appeal under the collateral order doctrine. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). This court recently left open the question of whether the doctrine applied in similar circumstances. *See Provi-*

*dence Journal,* 293 F.3d at 9. We find that it applies here. The standards for jurisdiction over a collateral order are "separability, finality, urgency, and importance." *In re Cont'l Inv. Corp.,* 637 F.2d 1, 5 (1st Cir.1980). All of these conditions are met here: the dispute concerning the Herald's access to documents is easily separated from the underlying criminal case; the order denying access disposes of the Herald's claim of an access right with finality; the news value of the information would decline over time, lending the interlocutory appeal urgency, *see Soto v. Romero-Barcelo (In re San Juan Star Co.),* 662 F.2d 108, 113 (1st Cir.1981); and the Herald presents an important unsettled legal question. The order denying access is a collateral order, and we have jurisdiction over the interlocutory appeal as well as the mandamus petition.

## B. *The CJA and Disclosure*

Before moving to the merits, we begin with some general context about the CJA and disclosure, which informs the analysis that follows.

The CJA provides for the government to pay for attorneys and related services at specified rates (usually well below market rates) on behalf of eligible criminal defendants. The statute applies to anyone who is "financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a). Guidelines promulgated by the Administrative Office of the United States Courts have elaborated slightly on this terse statutory definition, by saying that it applies to a defendant whose "net financial resources and income are insufficient to enable him to obtain qualified counsel" and

that the court should consider "the cost of providing the person and his dependents with the necessities of life." VII Admin. Office of U.S. Courts, *Guide to Judiciary Policies and Procedures* § 2.04 (2001) [hereinafter *A.O. Guide*].[1] "Inability to pay is not the same as indigence or destitution." *Museitef v. United States,* 131 F.3d 714 (8th Cir.1997); *see* 3A C.A. Wright, *Federal Practice & Procedure* § 732 (2d ed. 1982 & Supp.2002) (defining eligibility as defendant's inability to "pay for adequate representation without substantial hardship to himself or his family"). The court may request further information or verification from the defendant or court officers, and the prosecution or other interested parties may also present relevant information to assist the court in its determination. *See* VII *A.O. Guide* § 2.03.

The magistrate judge here engaged in such further factfinding, by requesting and receiving the summary of Connolly's legal bills. He then found that those prior legal bills and other liabilities were more than double Connolly's assets, and that Connolly was eligible for appointment of counsel under the CJA. Although it is possible to provide retroactive reimbursement for legal bills incurred before the CJA application was submitted, *see* 18 U.S.C. § 3006A(b), the order explicitly allowed payments only for services provided after March 5, 2002.

The magistrate judge also recommended that the district court consider at the close of the case whether Connolly's financial situation had improved. The CJA provides that "[w]henever the United States magistrate judge or court finds that funds

---

1. The judges of the District of Massachusetts have adopted a local CJA plan which looks to the *A.O. Guide* as binding. *See* 18 U.S.C. § 3006A(a) (requiring each district court to adopt plan); United States Dist. Court for the Dist. of Mass., *Plan for Implementing the*

*Criminal Justice Act of 1964, As Amended, 18 U.S.C. § 3006A,* § IX.B (1993) (stating that judicial officers in the District of Massachusetts "shall comply with the provisions" of the *A.O. Guide* concerning implementation of the CJA).

are available for payment from or on behalf of a person furnished representation, it may authorize or direct" that the person reimburse the CJA funds expended on his or her legal defense. 18 U.S.C. § 3006A(f); *see United States v. Merric,* 166 F.3d 406, 411 (1st Cir.1999) (allowing reimbursement of CJA funds as condition of supervised release where defendant has means to pay); *United States v. Fraza,* 106 F.3d 1050, 1056 (1st Cir.1997) (citing *United States v. Santarpio,* 560 F.2d 448, 455 (1st Cir.1977)) (court must hold hearing when determining whether defendant now has means to reimburse CJA funds). The guidelines rely on this opportunity for reimbursement to recommend that, initially, "[a]ny doubts as to a person's eligibility should be resolved in his favor; erroneous determinations of eligibility may be corrected at a later time." VII *A.O. Guide* § 2.04. Thus a decision to grant Connolly's application before trial, and revisit the issue afterwards if there were doubts as to his eligibility, was an ordinary application of the relevant law and rules.

The statute itself is silent about disclosure of documents demonstrating a defendant's financial eligibility for CJA status. The Act does require ex parte hearings for certain determinations, such as requests to fund expert services. *See* 18 U.S.C. § 3006A(e)(1); *United States v. Abreu,* 202 F.3d 386, 387, 389 (1st Cir.2000). Access to such requests may, of course, disclose defense strategy to the prosecution, and so do not involve the same interests as the issue before us. On the other hand, Congress added a new provision to the CJA in 1996 requiring disclosure of certain basic data about the amounts paid to lawyers under the Act, with specified exceptions. 18 U.S.C. § 3006A(d)(4); Pub.L. No. 104–

132, § 903(a) (1996).[2] None of the three documents at issue here includes that type of data. The CJA forms contain only personal financial information about the Connolly family. The sealed statement of legal fees summarizes Connolly's previous private legal bills, which were specifically excluded from CJA coverage. Nothing in the statute states whether these types of documents should be public.

The *A.O. Guide* sets out a general rule of disclosure and gives courts discretion to override it in particular cases:

> Generally, such information which is not otherwise routinely available to the public should be made available....

> Upon request, or upon the court's own motion, documents pertaining to activities under the CJA and related statutes maintained in the clerk's open files, which are generally available to the public, may be judicially placed under seal or otherwise safeguarded until after all judicial proceedings, including appeals, in the case are completed and for such time thereafter as the court deems appropriate.

VII *A.O. Guide* § 5.01(A) (2000). The guidelines specify situations that would justify departure from the general rule, including those where disclosure "could reasonably be expected to unduly intrude upon the privacy of attorneys or defendants." *Id.*

The magistrate judge quoted these passages and weighed the competing interests involved. In the exercise of his discretion, he concluded that it was appropriate to seal the documents at issue here, because disclosure would "unduly intrude" on the

---

**2.** The details of that provision have since been amended twice. *See* Pub.L. No. 106–113, Apx. A, § 308(a) (1999); Pub.L. No. 105–119,

§ 308 (1997). Neither amendment affected the silence concerning CJA eligibility documents.

privacy of Connolly and his family. He ruled that they would be sealed at least until Connolly exhausted his appeals. We do not consider this order to be a summary dismissal. The magistrate judge weighed the factors with due consideration of the presumption of disclosure embodied in the *A.O. Guide.* The court thus weighed the public's interest, which exists on both sides of this issue, as well as the defendant's interest.

This description of the CJA process raises two important issues. First, it calls into question whether the CJA eligibility documents are judicial documents at all. "Not all documents filed with a court are considered 'judicial documents.'" *United States v. Gonzales,* 150 F.3d 1246, 1255 (10th Cir.1998). Connolly argues that Congress could easily have delegated the task of determining a defendant's eligibility for CJA aid to a non-judicial officer or to an executive agency. Indeed, states use many different structures to govern their indigent defense programs, some of which are housed within the executive branch and some of which are independent agencies. *See generally* R.L. Spangenberg & M.L. Beeman, *Indigent Defense Systems in the United States,* Law & Contemp. Probs., Winter 1995, at 31, 37–41.[3] Current practice under the CJA also delegates many responsibilities in determining eligibility to non-judicial officers. *See* VII *A.O. Guide* § 2.03(B) (allowing court to designate other court employees to "obtain or verify the facts upon which [the CJA eligibility] determination is to be made"). The forms used to apply for CJA assistance are generated by the Administrative Office, and Connolly filed them with the Office of Pre–Trial Services rather than with the clerk of the court or the judge. These facts support a conclusion that the CJA eligibility documents are not essentially judicial in character.

Both the constitutional and the common law rights of access have applied only to judicial documents. *See El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 495 (1st Cir.1992) (discussing scope of First Amendment right of access and its limitation to judicial activities); *Fed. Trade Comm'n v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 408 (1st Cir.1987) ("Those documents which play no role in the adjudication process ... lie beyond reach" of common law presumption). There is no general constitutional right of access to information in the government's possession. *See Houchins v. KQED, Inc.,* 438 U.S. 1, 15, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (plurality opinion) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."); *Zemel v. Rusk,* 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information.").

A determination that the CJA eligibility documents are not judicial documents would dispose of the Herald's claims altogether. *See* M.A. Franklin, D.A. Anderson, & F.H. Cate, *Mass Media Law* 770 (6th ed. 2000) ("One question that

---

**3.** At the federal level, there have also been suggestions of a diminished role for judges in the administration of the CJA. *See, e.g., Gonzales,* 150 F.3d at 1255 n. 11 ("We note that there is much support for the replacement of [federal] judges with an independent administrative board...."); J.J. Cleary, *Federal Defender Systems,* Law & Contemp. Probs., Winter 1995, at 65, 69–75 (arguing for independent structure to administer CJA). *But see* VII *A.O. Guide* § 2.03(A) ("The determination of eligibility under the Criminal Justice Act is a judicial function to be performed by a federal judge or magistrate after making appropriate inquiries concerning the person's financial condition.").

runs through many of these cases is whether the materials at issue are judicial records. If the court decides that they are not, there appears to be no right of access under either the common law or the First Amendment."). While we think that these are not judicial documents, we hesitate to decide the issue here on that basis alone. Disentangling judges' judicial and administrative roles can be tricky, as seen in other areas, such as absolute judicial immunity. *See Forrester v. White,* 484 U.S. 219, 227, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) ("This Court has never undertaken to articulate a precise and general definition of the class of acts entitled to [judicial] immunity. The decided cases, however, suggest an intelligible distinction between judicial acts and administrative ... functions that judges may on occasion be assigned by law to perform."); E. Chemerinsky, *Federal Jurisdiction* § 8.6 (3d ed. 1999) ("Although the distinction between a judicial function and an administrative one is often clear, there are many instances in which the characterization of the task is problematic."). While we do not rely on this as the basis for our decision, we note that the administrative process of determining CJA eligibility is far removed from the core of the judicial function.

A second issue raised by this review is the distinction between the structure laid out in the *A.O. Guide* and the blanket prohibitions found in many other cases concerning constitutional rights of access. Courts have disfavored blanket rules which failed to account for individual circumstances. The Supreme Court emphasized this point when it overturned, on constitutional grounds, a Massachusetts law which automatically required the closing of a trial when a victim under the age of eighteen testified concerning certain specified sexual offenses. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 598, 602, 102 S.Ct. 2613, 73 L.Ed.2d 248

(1982). The Court there recognized that protecting a minor's well-being was a compelling interest, but found that this interest "does not justify a *mandatory* closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest." *Id.* at 608, 102 S.Ct. 2613; *see also id.* at 611, 102 S.Ct. 2613 (O'Connor, J., concurring) ("Massachusetts has demonstrated no interest weighty enough to justify application of its automatic bar to all cases, even those in which the victim, defendant, and prosecutor have no objection to an open trial."). Similarly, this court has interpreted a federal law to authorize, but not require, closing certain juvenile proceedings, and determined that there was therefore no need to reach the constitutional question. *See United States v. Three Juveniles,* 61 F.3d 86, 90–92 (1st Cir.1995).

The process for handling CJA eligibility documents such as Connolly's is not a blanket rule denying access. Rather, it strikes a balance under which disclosure is the presumed or default rule, but one which a court may displace by making a case-specific determination. *Cf. Providence Journal,* 293 F.3d at 12 ("Safeguards against prejudice can be implemented on a case-specific basis. Where a particularized need for restricting public access to legal memoranda exists, that need can be addressed by the tailoring of appropriate relief."); *Globe Newspaper Co. v. Pokaski,* 868 F.2d 497, 506–07 (1st Cir. 1989) (rejecting blanket rule in favor of case-by-case tailoring). The magistrate judge acted in accordance with this framework.

If a First Amendment right of access applies to this case, then it renders the entire discretion-based framework in the *A.O. Guide* unconstitutional. A court could meet the "stringent" First Amendment standard for sealing documents only

182

by articulating "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Providence Journal,* 293 F.3d at 11 (quoting *Press–Enterprise Co. v. Superior Court (Press–Enterprise I),* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). Despite its presumption of disclosure and its careful guidelines for exercising judicial discretion in overcoming the presumption, the *A.O. Guide* framework falls below this level of stringency. Constitutionalizing the access question, as the dissent would do, thus displaces the policy established by Congress and the courts. If constitutionalized, the court's discretion would be much more constrained and the balance would tilt much further toward disclosure. Applying the dissent's analysis to future cases would similarly oust legislative and rulemaking determinations about the proper balance between disclosure and privacy in the courts.

## C. *First Amendment Right of Access*

■ The Supreme Court recognized a qualified First Amendment right of access to certain judicial proceedings and documents in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). We examine two "complementary considerations" to determine if a constitutional right of access applies to particular documents such as Connolly's CJA forms and the summary statement of the legal fees he owed for prior representation. *Press–Enterprise Co. v. Superior Court (Press–Enterprise II),* 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986); *see Richmond Newspapers,* 448 U.S. at 589, 100 S.Ct. 2814 (Brennan, J., concurring) (applying similar standards in earlier case); *Pokaski,* 868 F.2d at 502–04 (applying *Press–Enterprise II* test to documents). First, we look at whether materials like these three docu-

ments have been open to the public in the past, "because a tradition of accessibility implies the favorable judgment of experience." *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. 2735 (internal quotations omitted). Second, we ask "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* If our inquiry into these considerations were to yield affirmative answers, the right could be overcome only by an "overriding interest." *Id.* (quoting *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. 819). We review constitutional access claims de novo. *Providence Journal,* 293 F.3d at 10.

Some courts have treated these considerations as a two-prong test, with a pair of elements that must both be satisfied. *See, e.g., United States v. El–Sayegh,* 131 F.3d 158, 160–61 (D.C.Cir.1997); *Baltimore Sun Co. v. Goetz,* 886 F.2d 60, 64 (4th Cir.1989). Connolly, not surprisingly, urges us to adopt this approach as well. We are unpersuaded that this is the correct reading of the "complementary considerations" of *Press–Enterprise II.* Because we find that neither of the standards is met here, however, we need not decide the question today.

### 1. *Case Law Applying First Amendment Standards*

The full scope of the constitutional right of access is not settled in the law. Courts have evaluated individual cases when they arose and have determined whether each fell within the category of judicial activities to which the right applies. *See generally* D. Paul & R.J. Ovelmen, *Access, in* 2 Communications Law 7 (Practicing Law Institute 1999) (classifying case law according to type of proceeding or document at issue). This process of case-by-case classification, based on the limited Supreme Court precedents, has produced a

list of proceedings and records that are covered by a First Amendment right of access and a list of those where no such right attaches.

Supreme Court precedent clearly extends the First Amendment right to cover access to criminal trials, *Richmond Newspapers*, 448 U.S. at 580, 100 S.Ct. 2814, including the voir dire of potential jurors, *Press–Enterprise I*, 464 U.S. at 509–10, 104 S.Ct. 819, and trial-like preliminary hearings in criminal cases, *El Vocero v. Puerto Rico*, 508 U.S. 147, 149–50, 113 S.Ct. 2004, 124 L.Ed.2d 60 (1993) (per curiam); *Press–Enterprise II*, 478 U.S. at 10, 106 S.Ct. 2735. *See also Globe Newspaper*, 457 U.S. at 610–11, 102 S.Ct. 2613 (overturning law requiring mandatory closing of criminal trials during testimony of minors who were victims of sexual abuse).

Beyond these few Supreme Court cases, lower courts have extended the right to various types of documents. This court has found the right applicable to legal memoranda filed with the court by parties in criminal cases, *see Providence Journal*, 293 F.3d at 11, and to records of completed criminal cases that. ended without conviction, *see Pokaski*, 868 F.2d at 505. *See also Hurley*, 920 F.2d at 97 (construing rules to require presumptive access to lists of jurors).

Courts have also held that no right of access applies to some other types of proceedings and documents. The paradigmatic example is the grand jury, whose proceedings are conducted in secret. *See Press–Enterprise II*, 478 U.S. at 9, 106 S.Ct. 2735 (citing *Douglas Oil Co. v. Petrol Stops N.W.*, 441 U.S. 211, 218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)) (grand jury is "classic" example of properly closed proceeding); Fed.R.Crim.P. 6(e) (establishing

general rule of grand jury secrecy with enumerated narrow exceptions); *cf. Hurley*, 920 F.2d at 94 (noting lack of public access to deliberations of petit jurors). The secrecy of the grand jury is so important that this court and others have found no right of access attaches to distinct hearings and documents because they could reveal secret grand jury information. *E.g., Pokaski*, 868 F.2d at 509; *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 500–03 (D.C.Cir.1998); *United States v. Smith*, 123 F.3d 140, 143 (3d Cir.1997). Courts have also rejected claims based on First Amendment rights of access to other types of documents, at least in certain circumstances. These have included discovery materials, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 37, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986), withdrawn plea agreements, *El–Sayegh*, 131 F.3d at 161, affidavits supporting search warrants, *Baltimore Sun*, 886 F.2d at 64–65, and presentence reports, *United States v. Corbitt*, 879 F.2d 224, 228 (7th Cir.1989).

Two courts of appeals have considered the First Amendment right of access to documents concerning the CJA. In both cases, however, the documents at issue related to CJA payments to attorneys, which raise few privacy issues, rather than to the CJA eligibility documents filed by defendants. The results these courts reached were not entirely consistent. The Tenth Circuit found no First Amendment right of access to the vouchers or backup materials that attorneys submit to receive payment under the CJA. *Gonzales*, 150 F.3d at 1250. In a case concerned with access to the "barebones data" found in attorneys' CJA vouchers[4] but not the more

---

4. Given the congressional amendments noted earlier, this type of "barebones data" is now

independently subject to disclosure under statute. Even there, however, the judge uses

detailed backup materials, the Second Circuit found a constitutional right of access. *United States v. Suarez*, 880 F.2d 626, 630–31 (2d Cir.1989); *cf. United States v. Ellis*, 90 F.3d 447, 450–51 (11th Cir.1996) (avoiding deciding First Amendment issue in CJA case by resting decision on textual interpretation of regulations).

■ As these cases demonstrate, the First Amendment does not grant the press or the public an automatic constitutional right of access to every document connected to judicial activity. Rather, courts must apply the *Press–Enterprise II* standards to a particular class of documents or proceedings and determine whether the right attaches to that class.

### 2. *Tradition*

■ One response to the "tradition" inquiry would point to the relatively recent vintage of the CJA, first enacted in 1964, and conclude that there has not been enough time for a longstanding practice of across-the-board disclosure to develop under the statute. Tradition is not meant, we think, to be construed so narrowly; we look also to analogous proceedings and documents of the same "type or kind." *Rivera–Puig v. Garcia–Rosario*, 983 F.2d 311, 323 (1st Cir.1992); *see El Vocero*, 508 U.S. at 150–51, 113 S.Ct. 2004 (finding pretrial criminal hearings in Puerto Rico

analogous to other pretrial hearings to which First Amendment right applies, despite distinctions noted by Puerto Rico Supreme Court); *Press–Enterprise II*, 478 U.S. at 10–11, 106 S.Ct. 2735 (evaluating California pre-trial hearings by looking to practices of other states and to other types of hearings, including probable cause hearing in Aaron Burr's 1807 trial for treason).

The analogies must be solid ones, however, which serve as reasonable proxies for the "favorable judgment of experience" concerning access to the actual documents in question. *Id.* at 8, 106 S.Ct. 2735.[5] The Herald strays too far from the particular nature of the CJA eligibility documents when it proposes two supposedly analogous traditions of openness, namely access to criminal trials and access to information about the expenditure of public funds.

The asserted "criminal trial" tradition is too broad an analogy. As seen from examples such as grand jury materials and pre-sentence reports, the mere connection of a document with a criminal case does not itself link the document to a tradition of public access. The Herald also argues that CJA eligibility determinations potentially implicate the defendant's constitutional rights, and that an erroneous denial of eligibility could be grounds for reversal of a conviction, so that these decisions are fundamentally tied to the trial itself.[6] The

discretion to consider a set of specified factors and redact certain information accordingly. *See* 18 U.S.C. § 3006A(d)(4)(D).

**5.** The dissent suggests glossing over the review of tradition when examining "proceedings of recent origin." We do not think we are free, under *Press–Enterprise II*, to simply ignore tradition. Analogies will frequently prove useful reasoning tools which lawyers are well trained to employ. *See generally* C.R. Sunstein, *On Analogical Reasoning*, 106 Harv. L.Rev. 741 (1993). While the absence of analogous tradition might not doom a claim where the functional argument for access to a

type of judicial document is strong, this is not such a case.

**6.** We can imagine situations where a defendant's eligibility for CJA funding might arise in the core of criminal proceedings, such as in an appeal challenging the denial of aid on Sixth Amendment grounds. *See, e.g., United States v. Manning*, 79 F.3d 212, 218–19 (1st Cir.1996) (reviewing district court denial of expert services for trial under CJA). Those scenarios are far removed from the case before us—the defendant is in a different posture and the interests involved are different— and we do not consider them here.

same could be said of other significant proceedings, including the grand jury, which remain closed. Documents submitted in conjunction with discovery proceedings, for example, do not thereby become part of the trial to which the tradition of access applies. *See Anderson,* 805 F.2d at 12; *see also State ex rel. WHIO–TV–7 v. Lowe,* 77 Ohio St.3d 350, 673 N.E.2d 1360, 1364 (1997) (applying rule on discovery to criminal proceeding).

Indeed, the breadth of the Herald's attack would go to any document in a criminal case ordered sealed by a court. The CJA eligibility documents are peripheral to Connolly's trial when compared to those processes where a tradition of access has triggered the First Amendment right, such as the selection of a jury, *Press–Enterprise I,* 464 U.S. at 505, 104 S.Ct. 819, or the legal memoranda submitted about the merits of the case, *Providence Journal,* 293 F.3d at 11. To conclude otherwise would create a right of access to everything remotely associated with criminal trials, and would be contrary to precedent employing more finely honed classifications.

The Herald also suggests that there is an "expenditure of public funds" tradition of access. This comparison collapses on examination as well. The premise is itself overbroad. Prosecutors, for instance, do not traditionally publish detailed information explaining their use of government resources, much less break it down on a case-by-case basis. *See Gonzales,* 150 F.3d at 1255. The CJA itself contemplates ex parte non-adversarial proceedings for certain determinations involving expenditures for indigent defense, despite the resulting expenditure of public funds.

As support for its "public funds" approach, the Herald argues that civil fee-shifting determinations have traditionally been public, and cites a district court opinion from Florida that used this analogy, *United States v. Ellis,* 154 F.R.D. 692, 695–96 (M.D.Fla.1993), *aff'd on other grounds,* 90 F.3d at 451 ("In the civil context, there is a long history of detailed disclosure about attorney fees and the services rendered when there is a fee-shifting statute or contract."). That tradition is very different from the facts at hand. *See generally Gonzales,* 150 F.3d at 1257 (rejecting similar analogy between fee-shifting and CJA). Fee-shifting disputes occur in the context of adversarial litigation. *Id.* The claimant files a public document stating its fees and costs. That document is more akin to a statement of CJA funds paid to attorneys after they have been appointed—a statement which is generally made public and is quite different from data about a criminal defendant's personal financial circumstances. Moreover, attorney's fees in civil cases can be conceptualized as part of the award to a prevailing party for unlawful conduct against it if certain standards are met. *See, e.g., Tamko Roofing Prods., Inc. v. Ideal Roofing Co.,* 282 F.3d 23, 30–32 (1st Cir.2002) (analyzing attorney's fee awards under Lanham Act in context of losing party's unlawful behavior). No such similar policy is involved in the determination that a defendant is eligible to have counsel appointed under the CJA.

Connolly offers a better analogy when he cites to government benefits programs administered by the executive branch, where the strong tradition is one of confidentiality rather than disclosure. *See, e.g.,* 42 U.S.C. § 302(a)(7) (2000) (establishing safeguards to prevent public disclosure of information about Social Security recipients). We would think it the exception, not the rule, to require applicants for benefits programs to disclose private financial data about themselves and their immediate family to the public.

Finally, the Herald's reliance on dicta in *Foley v. City of Lowell* to demonstrate the "public funds" tradition is misplaced. 948 F.2d 10, 19 (1st Cir.1991) ("[T]he *continued* viability of and confidence in the public funding of certain litigation are dependent on the perception that claims for counsel fees are subject ... to the independent review of a court.") (emphasis added by petitioner-appellant; internal quotation omitted). *Foley* had nothing to do with the CJA; it analyzed civil fee-shifting in a police brutality case under 42 U.S.C. § 1988. *See* 948 F.2d at 18. More fundamentally, *Foley* had nothing to do with public access; it concerned a court's independent duty to probe a civil plaintiff's calculation of awarded attorney's fees when the governmental defendant who would pay the fees "mounted no meaningful opposition" to it. *Id.* at 19 ("At least where public funds are involved or the public interest is otherwise implicated, the court has a duty to consider the application critically to ensure overall fairness...."). None of this lends any support to the existence of a relevant tradition of public access.

The "judgment of experience" does not support a constitutional right of access to CJA eligibility materials.

### 3. *Positive Functional Role*

The other consideration under *Press–Enterprise II* is whether access to CJA eligibility documents "plays a particularly significant positive role in the actual functioning of the process." 478 U.S. at 11, 106 S.Ct. 2735. Here, the process in question is one of determining eligibility for CJA assistance. Not only does public access to a defendant's financial documentation in support of a CJA application fall short of this standard, more likely it would play a negative role.

■ The scope of this standard warrants clarification. The Herald misinterprets the proper inquiry when it argues that privacy interests may receive no consideration at all during this stage. Instead, according to the Herald, "countervailing interests do not even enter into the analysis until after the qualified right has been established." Only at that point, says the Herald, when the court considers whether particular circumstances overcome a qualified right of access, may it look to privacy or other concerns that militate against disclosure in a given case. But a test that is blind to the functional drawbacks of access becomes no test at all. The reason is that "there are some kinds of government operations that would be totally frustrated if conducted openly," *Press–Enterprise II*, 478 U.S. at 9, 106 S.Ct. 2735 (discussing functional standard), or would at least be hindered. It may be that the process of determining CJA eligibility is one of those. That cannot be ascertained without some reference to the potential problems created by public access as well as to the advantages.[7]

---

**7.** Once a First Amendment right attaches, during the next stage, when the court decides whether the qualified right is overcome, it considers factors relevant to a particular case. *See, e.g., Pokaski*, 868 F.2d at 506 & n. 17 (discussing how some individual defendants may demonstrate circumstances particular to their case requiring the sealing of records that are otherwise covered by qualified First Amendment right of access). We do not rely on factors which are atypical of a process when considering whether the right attaches to that process in general. For example, Connolly notes that his CJA forms include the amount of certain family medical bills; this is idiosyncratic to his case and would be an inappropriate basis for determining the applicability of the right as a whole. The broader privacy concerns we articulate in the text, however, would be common to most CJA applicants.

First, CJA eligibility determinations, if they are judicial at all, lie far from the core of judicial power or the merits of the criminal case. Many of the flagship functional justifications for access thus become less relevant. Unlike trials themselves, access to the defendant's CJA financial statements does not provide an "outlet for community concern, hostility, and emotion" concerning a crime. *Richmond Newspapers*, 448 U.S. at 571, 100 S.Ct. 2814. And, unlike other decisions that may "impose official and practical consequences upon members of society at large," *id.* at 597, 100 S.Ct. 2814 (Brennan, J., concurring), CJA eligibility determinations never do so.

A remaining functional "advantage" which the Herald advances is the oft-cited need for the public to have the "full understanding" necessary to "serve as an effective check on the system." *Pokaski*, 868 F.2d at 502, *quoted in Providence Journal,* 293 F.3d at 10. In isolation, the "full understanding" rationale proves too much—under it, even grand jury proceedings would be public. As to the "effective check" rationale, we have doubts about whether public scrutiny of an applicant's financial data would actually improve judges' decisionmaking as to CJA eligibility. *See Gonzales,* 150 F.3d at 1260.

Under the *A.O. Guide* framework, CJA eligibility decisions will be fully open to public scrutiny in cases where no particular privacy concerns are present for whatever reasons, or where the defendant does not object to disclosure. The fact that an application was filed and an attorney appointed are public matters which are entered on the docket of a case. The general reason for Connolly's financial need, rational on its face, was articulated in the order appointing his attorney, also a public document. The amounts of money paid to Connolly's attorney will presumably be made public in due course under the newest version of § 3006A(d)(4). The only significant aspects of Connolly's CJA application that were not made public are the details of his family's assets, liabilities, and financial obligations.

Public access to a defendant's financial information would not usually facilitate greater accuracy in decisionmaking. The standards for granting CJA assistance are flexible and give the benefit of the doubt to a defendant who applies for aid. The type of information on the forms is not typically in the public domain and so the public is not well-positioned to challenge accuracy. If the judge has doubts about the accuracy of the financial information submitted, the data may be investigated or more information provided by defendants, court officers, or prosecutors. *See* VII *A.O. Guide* § 2.03. If the data is inaccurate, the court may rescind the appointment and order the defendant to repay any funds spent. 18 U.S.C. § 3006A(f). Since a defendant's financial condition is usually investigated in the process of preparing a presentence report, the court is aware that, in the event of a conviction, there will be an independent examination of a defendant's financial status at that time. In addition, there are possible criminal consequences for a defendant who knowingly files false information; CJA Form 23 indicates clearly that it is signed and submitted under penalty of perjury.

Finally, each individual CJA appointment may involve a comparatively small amount of money, normally capped at $5,200 for a felony case. *See* 18 U.S.C. § 3006A(d)(2). The actual amount of money spent on appointed counsel is public. *See id.* § 3006A(d)(4). Under the functional standard of *Press–Enterprise II,* the real-world "positive role" of public scrutiny of CJA eligibility materials is negligible at best.

On the other hand, the disclosure of a defendant's sensitive personal financial information, which has no bearing on the merits of the criminal trial, could well undermine the judicial process in other ways. In itself, the invasion of privacy inherent in disclosing this data is of concern. *See Corbitt*, 879 F.2d at 230–32 (weighing defendants' personal privacy interests when maintaining seal on presentence reports). This concern is magnified by the crucial role of the CJA as a vehicle to effectuate Sixth Amendment rights for defendants who cannot afford legal representation.

A constitutionally-based right of access to otherwise private personal financial data of one's own and one's family imposes a high price on the exercise of one's constitutional right to obtain counsel if in financial need. Our system of justice cherishes "the principle that defendants are not to be avoidably discriminated against because of their indigency." *Holden v. United States*, 393 F.2d 276, 278 (1st Cir.1968). But a strict disclosure requirement could well discourage eligible defendants from availing themselves of their right to counsel by forcing them to choose between privacy and CJA assistance—a choice that other defendants do not face.[8] The specter of disclosure also might lead defendants (or other sources called upon by the court) to withhold information. Public disclosure of such information may put them at risk of harm to their property or their families if the information is misused by their enemies. There is a prospect of unbalancing the scales in a criminal prosecution if the information in CJA application materials could assist the prosecution, thus raising the specter of claims of denial of Fifth Amendment rights. *Cf. Gonzales*,

150 F.3d at 1259 ("[CJA] information obtained after judgment could still be used by the government to investigate and bring new charges. . . ."). Such effects tend to disrupt, not enhance, the functioning of the process.

Under the Federal Rules of Criminal Procedure, presentence reports must contain the very same type of financial information as is found in CJA forms. *See* Fed.R.Crim.P. 32(d)(2)(A)(ii). But presentence reports are presumptively confidential documents. "[T]he courts have typically required some showing of special need before they will allow a third party to obtain a copy of a presentence report." *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 12, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988); *see United States v. Smith*, 13 F.3d 860, 867 (5th Cir.1994); *Corbitt*, 879 F.2d at 229. This standard for disclosure is obviously not the First Amendment standard, which presumes disclosure. As another circuit noted, even in the face of a *Brady* request for information from another defendant's presentence report, the financial condition of the defendant is confidential and intensely personal. *United States v. Trevino*, 89 F.3d 187, 191 (4th Cir.1996). No circuit court has held that third parties have a constitutional right of access to presentence reports; rather, courts have reached the contrary result. *See Corbitt*, 879 F.2d at 237. Self-evidently, the presentence report, on which sentences are based, is closer to the heart of judicial proceedings than the CJA eligibility documents. It is difficult to understand why, if there is no First Amendment right of access to information about a defendant's financial condition at sentencing and during his imprisonment, there could be a

---

**8.** The dissent notes that indigent criminal defendants will have little choice but to accept the loss of privacy in exchange for CJA funds; this observation makes the case against disclosure stronger, not weaker. The law does not force criminal defendants to make such a Hobson's choice.

First Amendment right of access to a statement of the defendant's financial information at trial, when he is presumed innocent and is merely exercising his Sixth Amendment right to counsel.

On balance, then, disclosure would not play "a particularly significant positive role in the actual functioning of the process" of determining CJA eligibility. *Press–Enterprise II*, 478 U.S. at 11, 106 S.Ct. 2735. Rather, disclosure is likely to play a negative role. Nor do the lessons of tradition support the wisdom of public access. The First Amendment does not grant a right of access, over the defendant's objection, to financial documents submitted to demonstrate the defendant's eligibility for CJA funds. The current CJA framework, in which these materials are typically disclosed unless the court decides that the documents should be sealed, is constitutional.

### D. Common Law Presumption of Access

■ In addition to any constitutional right, there is also a presumption of public access to "judicial records" under the common law. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Anderson*, 805 F.2d at 13. The Herald argues that this presumption invalidates the sealing of Connolly's CJA eligibility documents. Assuming that any common law right has not been displaced by the statute, *see Gonzales*, 150 F.3d at 1263, we hold that the presumption is not applicable to these types of documents, and that if it were, the magistrate judge still correctly exercised his discretion in finding it overcome by countervailing interests.

The common law presumption is limited to "judicial records." As we have established already, we do not think that CJA eligibility documents qualify as such. Rather, they are administrative paperwork

generated as part of a ministerial process ancillary to the trial. While the review of these documents is conducted by a district judge or magistrate judge, that role could have been assigned to another institution.

In cases considering the common law right, this court has often used a definition of a "judicial record" which refers to "materials on which a court relies in determining the litigants' substantive rights." *See, e.g., Providence Journal*, 293 F.3d at 16 (quoting *Anderson*, 805 F.2d at 13). The Herald seizes on this language and argues that the right to counsel in a criminal trial is, of course, a substantive right guaranteed by the Sixth Amendment. This argument takes our shorthand definition out of context. In *Anderson*, where it originated, the phrase was used to distinguish documents presented to a judge in connection with a discovery dispute from the record on which a judge actually decides the central issues in a case. 805 F.2d at 13 ("[D]iscovery is fundamentally different from those proceedings for which a [common law] public right of access has been recognized."). Similarly, we have applied this definition to documents on which a court relied in approving a consent decree because that approval settled a civil enforcement action. *Standard Fin. Mgmt.*, 830 F.2d at 408–09.

■ Here, in contrast, the court did not conduct its review of Connolly's finances in order to dispose of any issue as to the elements of the criminal charges against him. As in *Anderson*, the CJA eligibility documents related merely to the judge's role in management of the trial. *Cf. Standard Fin. Mgmt.*, 830 F.2d at 408 (excluding from presumption "documents which play no role in the adjudication process"). Other administrative decisions that effectuate constitutional rights are made outside the judiciary entirely, and create no presumption of access to the documents

used in the decision. For example, prisoners are constitutionally entitled to medical treatment, *Estelle v. Gamble*, 429 U.S. 97, 102–104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), but the decision to provide treatment is not thereby "judicial," nor do a prisoner's medical records thereby become "judicial documents." *Cf. Doe v. Delie*, 257 F.3d 309, 315–16 (3d Cir.2001) (privacy of prisoner medical information).

■ Even assuming that CJA eligibility documents were covered by a common law presumption of access, we would still affirm the magistrate judge's decision to maintain the sealing of Connolly's CJA application materials. The standard for our review is abuse of discretion. *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 10 (1st Cir.1998) ("The trial court enjoys considerable leeway in making decisions of this sort."). "[T]he decision as to [common law] access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S. at 599, 98 S.Ct. 1306. The magistrate judge's short but clear order balanced the public interest in the information against privacy interests, and his conclusion was not an abuse of discretion.

■ Personal financial information, such as one's income or bank account balance, is universally presumed to be private, not public. *See United States v. Amodeo (Amodeo II )*, 71 F.3d 1044, 1051 (2d Cir.1995) (courts analyzing common law presumption should "consider the degree to which the subject matter is traditionally considered private rather than public"). The magistrate judge sensibly concluded that Connolly's strong interest in the privacy of his and his family's personal financial information outweighs any common law presumption in these circumstances.

Recognition of the importance of financial privacy is also enshrined in public policy. The Freedom of Information Act, applicable only to executive branch materials, exempts personal and confidential financial information from disclosure. *See* 5 U.S.C. § 552(b)(4) (2000). Congress recently singled out financial information for special privacy protection when it approved an overhaul of the nation's banking regulations. *See* Gramm–Leach–Bliley Act of 1999 (GLB Act), Pub.L. No. 106–102, §§ 501–510 (1999) (codified at 15 U.S.C. §§ 6801–6809 (2000)); *Trans Union LLC v. Fed. Trade Comm'n*, 295 F.3d 42 (D.C.Cir.2002) (upholding regulations implementing GLB Act's privacy provisions). *See generally* Elec. Privacy Info. Ctr., *The Gramm–Leach–Bliley Act*, at http://www.epic.org/privacy/glba. States are also considering greater protection for financial privacy. *See* Gen. Accounting Office, *Financial Privacy* (April 2002) (summarizing state implementation of GLB Act's provisions concerning insurance industry); A. Clymer, *North Dakota Tightens Law on Bank Data and Privacy*, N.Y. Times, June 13, 2002, at A28 (reporting that 72 percent of voters in statewide referendum supported tighter financial privacy restrictions than federal law); R. Gold, *States Mull Opt–In, Opt–Out Rules*, Wall St. J., Mar. 13, 2002, at B8, *available at* 2002 WL–WSJ 3388589 (reporting greater interest in state legislatures because "consumers [are] increasingly worried about having their financial data open to scrutiny").

In addition, the Supreme Court has explained that a court considering the common law presumption enjoys "supervisory power" to deny access where "court files might have become a vehicle for improper purposes" and to "insure that its records are not 'used to gratify private spite or promote public scandal.'" *Nixon*, 435 U.S. at 598, 98 S.Ct. 1306 (quoting *In re*

*Caswell,* 18 R.I. 835, 29 A. 259, 259 (R.I. 1893)). The magistrate judge would be well within his discretion to consider this factor as well.

Finally, the invasiveness of the disclosure sought here is further intensified because the information pertains not only to Connolly, but also to his wife and children. *See Amodeo II,* 71 F.3d at 1050 (giving increased weight to privacy interests of "innocent third parties").

Thus, even if a common law presumption applied to Connolly's CJA forms and statement of prior legal fees, we would still affirm the magistrate judge's decision.

### III.

While the Herald has presented its case ably, we hold that neither the First Amendment nor the common law provides a right of access to financial documents submitted with an initial application to demonstrate a defendant's eligibility for CJA assistance. We also hold that, even if there were a common law presumption of access, then it would be outweighed here, as the courts below found, by Connolly's countervailing privacy interests. There may come a time in the future of these proceedings when it would be appropriate to lift the seal on Connolly's CJA application materials; we leave that decision, like the original decision to seal, to the discretion of the district court.

The petition for a writ of mandamus is *denied* and the decision of the district court is *affirmed.*

LIPEZ, Circuit Judge, dissenting.

The Boston Herald intervened in the criminal trial of John J. Connolly, Jr., seeking to unseal three documents submitted by Connolly as part of his application under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A (2000), for government payment of a portion of his attorney's fees and legal expenses. Two documents are an original and amended CJA Form 23 affidavit, and the third document reflects Connolly's outstanding legal fees at the time of his application. The CJA Form 23 requires applicants to provide detailed information about their family status, employment income, other assets (including other income, cash, and property) and debt obligations.

The magistrate judge denied the Herald's motion, determining that "[t]here is no First Amendment right of access to CJA-related backup documentation, motions, orders and hearing transcripts.... Further, the [CJA] statute and regulations ... supercede the common law right if one existed." Noting that he had originally sealed the documents because their disclosure would "unduly intrude upon the privacy of the defendant," the magistrate judge reaffirmed his earlier position: "I decline to exercise my discretion to unseal the documents at this time because I find that the intrusion on the privacy of the defendant and that of his family if the documents were released would be as substantial now as it was when the sealing orders were entered."

This disposition of the Boston Herald's claims is tantamount to a ruling that CJA eligibility forms, which contain only personal financial information, may be shielded from public disclosure without balancing the public interest in a particular applicant's eligibility information against the degree of intrusion into the applicant's privacy. Because I conclude that a qualified right of public access attaches to CJA eligibility information under both the common law and the First Amendment, I cannot agree with the majority's decision to uphold the magistrate judge's summary dismissal of the Boston Herald's claims. The public right of ac-

cess under these two doctrines constrains the discretion of judges to seal CJA Form 23 information. Accordingly, I would remand this case for a determination of whether the public's right of access under the First Amendment is overcome "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *In re Providence Journal Co.*, 293 F.3d 1, 11 (1st Cir.2002) (citing *Press–Enterprise v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*)).

## I.

### A. *The Judicial Character of the Documents*

Documents generated in the course of a judicial proceeding must be "judicial" documents to trigger a common law presumption of access. This judicial character is also a necessary but not sufficient condition to establish a qualified right of access under the First Amendment. *See Providence Journal*, 293 F.3d at 9–10. Thus, the Boston Herald has no claim of access to materials classified as "administrative" documents. *See El Dia, Inc. v. Hernández Colón*, 963 F.2d 488, 495 (1st Cir.1992); *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 408 (1st Cir.1987). Therefore, I first address the question of whether the CJA eligibility forms are judicial documents.

#### 1. *The Role of Judges in the Eligibility Inquiry*

The CJA anticipates the involvement of a "United States magistrate judge or the court" in nearly every phase of the appointment process, including the generation of a plan for furnishing representation, 18 U.S.C. § 3006A(a), the determination of whether appointment of counsel

is appropriate, 18 U.S.C. § 3006A(b), the determination of the duration of appointments, 18 U.S.C. § 3006A(c), the waiver of the maximum compensation rates when justice demands, 18 U.S.C. § 3006A(d)(3), the public disclosure of the amounts paid to appointed counsel, 18 U.S.C. § 3006A(d)(4), and the authorization of reimbursement for investigative, expert, or other services deemed necessary for adequate representation, 18 U.S.C. § 3006A(e)(1). Indeed, the regulations promulgated to implement the CJA explicitly state that "[t]he determination of eligibility for representation under the Criminal Act is a *judicial function* to be performed by a federal judge or magistrate after making appropriate inquiries concerning the person's financial condition." VII *Administrative Office of the United States Courts' Guide to Judiciary Policies and Procedures* (hereinafter *"A.O. Guide"*) § 2.03 (2001) (emphasis added).

Congress's decision to delegate this authority exclusively to judges is not surprising—ensuring that criminal defendants receive the full benefits of the Sixth Amendment's guarantee of effective assistance of counsel has always been the unique province of the judiciary. Judges are required, *inter alia*, to establish that criminal defendants who proceed *pro se* have knowingly and intelligently waived their right to counsel, *see United States v. Manjarrez*, 306 F.3d 1175, 1179 (1st Cir. 2002), to appoint counsel who are appropriately "learned in the law" to represent defendants facing capital charges, *United States v. Miranda*, 148 F.Supp.2d 292 (S.D.N.Y.2001), and to exempt applicants from the statutory requirement of filing a CJA Form 23 where doing so would prejudice the defendant's other constitutional rights, *see United States v. Gravatt*, 868 F.2d 585, 589 (3d Cir.1989) (reversing trial

court's denial of request for appointed counsel where applicant was charged with tax evasion and refused to complete the CJA Form 23 on grounds that it would be self-incriminating); *United States v. Moore*, 671 F.2d 139, 141 (5th Cir.1982), *cert. denied*, 464 U.S. 859, 104 S.Ct. 183, 78 L.Ed.2d 163 (1983) (same); *United States v. Anderson*, 567 F.2d 839, 840 (8th Cir.1977) (same). The judicial character of the eligibility inquiry that determines a defendant's Sixth Amendment right to counsel is not undermined by the fact that administrative personnel are occasionally entrusted with judgments that effectuate constitutional rights in settings outside the courtroom, where one would not expect judges to render initial decisions. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 102–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (adjudicating prisoner's claim that prison doctor violated Eighth Amendment by refusing to provide adequate medical care).

Congress also mandated that the judge undertake an individualized inquiry into a defendant's financial ability to retain counsel:

> [T]he United States magistrate judge or the court, *if satisfied after appropriate inquiry* that the person is financially unable to obtain counsel, shall appoint counsel to represent him. Such appointment *may* be made retroactive to include any representation furnished pursuant to the plan prior to appointment. The United States magistrate or the court shall appoint separate counsel for persons *having interests that cannot properly be represented by the same counsel*, or *when other good cause is shown*.

18 U.S.C. § 3006A(b) (emphasis added). Implicitly, this provision acknowledges the important relationship between an applicant's financial status and the circumstances of the underlying case. An applicant with moderate resources may nevertheless qualify for appointed counsel under the CJA for representation in a complex murder trial, whereas a defendant of considerably lesser means may not be eligible for representation in a prosecution for a less serious offense. The judge conducting the trial or a magistrate judge equally familiar with the facts and proceedings of the case is uniquely positioned to assess the applicant's financial position against the backdrop of past, present and anticipated expenditures in the underlying action.

Significantly, the CJA further obliges the judge to continually reevaluate the need for appointed counsel as the underlying proceeding progresses:

> If at any time after the appointment of counsel the United States magistrate judge or the court finds that the person is financially able to obtain counsel or to make partial payment for the representation, it may terminate the appointment of counsel, or authorize payment ... as the interests of justice may dictate. If at any stage of the proceedings, including an appeal, the United States magistrate judge or the court finds that the person is financially unable to pay counsel whom he had retained, it may appoint counsel ... and authorize payment ... as the interests of justice may dictate. The United States magistrate judge or the court may, in the interests of justice, substitute one appointed counsel for another at any stage of the proceedings.

18 U.S.C. § 3006A(c). Under the CJA, administrative personnel assist magistrate and district judges in rendering eligibility determinations by generating CJA forms, accepting service of CJA application materials, and helping "to obtain or verify the facts upon which [the eligibility] determination is to be made." VII *A.O. Guide*

§ 2.03(B). However, these individuals lack the expertise to weigh "the interests of justice" when considering whether to approve or withdraw an appointment at an intermittent stage in the proceedings, and would also be hard-pressed to continuously monitor the developments in the underlying case. These realities reinforce the wisdom of Congress's decision to repose CJA decisionmaking authority in judges.

### 2. The Role of CJA Form 23 Information in the Eligibility Inquiry

While the critical role that judges play in the eligibility inquiry evinces the judicial character of the documents they rely upon, the dispositive significance of those documents further enhances their "judicial" status. In *United States v. Amodeo*, 44 F.3d 141 (2d Cir.1995) ("*Amodeo I*"), the Second Circuit established the following functional definition of "judicial document": "We think that the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." *Id.* at 145.[9] This definition distinguishes CJA eligibility forms from other documents generated in judicial proceedings, such as materials produced during discovery, that courts are often reluctant to classify as "judicial documents":

> [I]t must be recognized that an abundance of statements and documents generated in federal litigation actually have little or no bearing on the exercise of Article III judicial power. The relevance or reliability of a statement or document cannot be determined until heard or read by counsel, and, if necessary, by the court or other judicial officer. As a result, the temptation to leave no stone unturned in the search for evidence material to a judicial proceeding turns up a vast amount of not only irrelevant but also unreliable material. Unlimited access to every item turned up in the course of litigation would be unthinkable. Reputations would be impaired, personal relationships ruined, and businesses destroyed on the basis of misleading or downright false information.

*United States v. Amodeo*, 71 F.3d 1044, 1048–49 (2d Cir.1995) ("*Amodeo II*"); *see Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986). Yet the relevance and reliability vexations afflicting the discovery process are inapplicable to CJA eligibility information, which is (1) submitted under penalty of perjury and thus presumptively reliable, and (2) singularly relevant to the court's determination of whether an applicant is entitled to appointed counsel. *See United States v. Salemme*, 985 F.Supp. 197, 201 (D.Mass. 1997) ("Typically, the CJA 23 form of financial affidavit ... is used to determine

---

**9.** This is a more exacting standard than the test employed in other jurisdictions. The Third Circuit, for example, has held that "it [is] the act of filing *vel non* that trigger[s] the presumption of access." *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 161–62 (3d Cir.1993) (listing cases in which "other courts have also recognized the principle that the filing of a document gives rise to a presumptive right of public access."). Indeed, we have previously ruled that "relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies." *Standard Financial*, 830 F.2d at 409. Under these criteria, documents such as search-warrant affidavits and presentence reports are classified as judicial documents to which a qualified common law right of access attaches. *See In re Baltimore Sun Co.*, 886 F.2d 60, 65 (4th Cir.1989) (search warrant affidavits); *United States v. Corbitt*, 879 F.2d 224, 237 (7th Cir.1989) (presentence reports).

whether a defendant is eligible for the appointment of counsel.").

### 3. *The Narrow Scope of the "Administrative Document" Exception*

The critical role that judges play in the eligibility determination, coupled with the significance of the financial documents themselves to that determination, counsel strongly in favor of classifying the eligibility forms as judicial documents. The majority suggests, however, that the CJA eligibility forms fall outside the category of judicial documents by virtue of their "administrative" character, characterizing the documents as "administrative paperwork generated as part of a ministerial process ancillary to trial." Yet we, along with the Second Circuit, have recognized that courts act at the apex of their Article III power whenever they conduct proceedings that determine the substantive rights of litigants: "[T]he strong weight to be accorded the public right of access to judicial documents [is] largely derived from the role those documents play[ ] in determining litigants' substantive rights—conduct at the heart of Article III—and from the need for public monitoring of that conduct." *Amodeo II*, 71 F.3d at 1049; *see Providence Journal*, 293 F.3d at 9–10 ("[T]he common-law right of access extends to 'materials on which a court relies in determining the litigants' substantive rights.'" (quoting *Cryovac*, 805 F.2d at 13)).

Thus, courts may act pursuant to their Article III authority in proceedings antecedent to a criminal trial even when they address matters that are peripheral to the merits of the underlying dispute. *Cf. Providence Journal*, 293 F.3d at 10 ("The constitutional right of access [to judicial records] is not limited to the actual trial itself, but also encompasses most pretrial proceedings."). The Supreme Court acknowledged as much in *Press–Enterprise I*, ruling that a qualified right of public access attached to the transcript of the voir dire examination of potential jurors in a criminal trial. *See Press–Enterprise I*, 464 U.S. at 501, 104 S.Ct. 819. Indeed, we ruled in *Standard Financial* that a common law right of public access attached to financial documents that a district court reviewed in determining whether to approve a consent decree between the Federal Trade Commission and a corporation accused of engaging in deceptive marketing practices. *Standard Financial*, 830 F.2d at 405. Because the court had conditionally approved the consent decree before examining the documents in question, the plaintiffs argued that "the statements could not have been court records upon which [the judge] relied in the adjudicatory process." *Id.* at 408. We disagreed, finding that the plaintiffs' argument "takes too restrictive a view of what constitutes a court record for the purpose of allowing public access." *Id.* at 408, 830 F.2d 404.

Here, the CJA eligibility forms are more proximately connected to a court's determination of substantive rights than either the voir dire transcript in *Press–Enterprise I* or the financial documents submitted to gain approval for a consent decree in *Standard Financial*. As a threshold matter, the eligibility inquiry determines an applicant's substantive right to counsel under both the Sixth Amendment and the CJA itself, to the extent that particular courts may expand their conception of financial need such that the statutory and constitutional standards are not coextensive. Moreover, this inquiry occurs within the same adversarial setting that typifies other judicial determinations of substantive rights. *See United States v. Coniam*, 574 F.Supp. 615, 617 (D.Conn. 1983) ("The role of the government in relation to the utilization of the CJA appropriation for the guarantee of defendant's

rights, while nowhere specified, is nonetheless appropriately invited by the approval of an adversarial process by which to insure the propriety of defendant's receipt of services of counsel under the CJA.") (citing *United States v. Harris*, 707 F.2d 653, 662 (2d Cir.1983)). Thus, the government is entitled and encouraged to contest CJA appointments for applicants it deems unworthy, *see United States v. Hickey*, 997 F.Supp. 1206, 1207 (N.D.Cal. 1998); *United States v. Herbawi*, 913 F.Supp. 170, 173 (W.D.N.Y.1996), and to actively defend a court's decision to deny appointed counsel if the spurned applicant challenges the decision on appeal, *see United States v. Lefkowitz*, 125 F.3d 608, 621 (8th Cir.1997); *Harris*, 707 F.2d at 660–62.

Under Connolly's narrower conception of Article III, a court only exercises Article III power to resolve the merits of the underlying case or controversy: "Article III functions—i.e., the adjudication of federal cases and controversies—are those which the Constitution assigns uniquely to the federal courts." The application of this rule would have the odd result of creating a qualified right of public access to only those financial affidavits that become the subject of an appeal, where the applicant's financial information would be inextricably linked with the merits in the appellate proceeding. The supposition that a bona fide public interest in CJA eligibility only materializes if and when a party appeals the court's initial eligibility determination is difficult to harmonize with the principles underlying the common law presumption of access to judicial documents:

> The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the adminis-

tration of justice. . . . Although courts have a number of internal checks, such as appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control. Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior. Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.

*Amodeo II*, 71 F.3d at 1048. The importance of this monitoring function does not fluctuate between an original and appellate proceeding under the CJA, and therefore any rule that purports to confine the Article III imprimatur to documents that directly inform the adjudication of the underlying case or controversy is unduly narrow.

I acknowledge that administrative personnel play an important supporting role in the eligibility inquiry prior to the judicial determination of eligibility. Nevertheless, the administrative features of the eligibility inquiry do not erode the fundamental Article III character of CJA eligibility forms, thereby transforming them into "administrative" documents. Excepting the decision of the Tenth Circuit in *United States v. Gonzales*, 150 F.3d 1246 (10th Cir.1998), no court to my knowledge has invoked the judicial/administrative distinction to carve an "administrative" exception to the presumptively judicial character of documents that must be filed with the court as a required basis for judicial decision making. Indeed, many jurisdictions simply accord "judicial document" status to all materials filed with the court, regardless of the particular judicial function for which the documents are relevant. *See supra.*

To the extent that some courts have fashioned a distinction between "judicial" and "administrative" documents, this distinction has been cast in institutional terms and employed narrowly to shield state and federal executive branch materials from the presumption of access accorded documents in judicial proceedings. Thus, in *El Dia*, we upheld an executive order issued by the governor of Puerto Rico limiting access to documents detailing his off-island travel expenses, observing that "[w]hile the Supreme Court has recognized a qualified First Amendment right of access to records and proceedings connected to the criminal justice system ... the Court has never recognized a corresponding right of access to Executive Branch documents." *El Dia*, 963 F.2d at 494–95 (internal citations omitted). Similarly, the Supreme Court refused to extend First Amendment protection to members of the media attempting to photograph and tour a county jail where an inmate had recently committed suicide, purportedly in response to deteriorating conditions at the prison. *Houchins v. KQED, Inc.*, 438 U.S. 1, 3, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). According to the plurality:

> Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control ... [U]ntil the political branches decree otherwise, as they are free to do, the media have no special right of access to the [jail] different from or greater than that accorded the public generally.

*Id.* at 15–16, 98 S.Ct. 2588. The broad institutional and political considerations that informed the decisions in *El Dia* and *Houchins* are not implicated by media requests for the financial information filed by CJA applicants in the midst of a criminal proceeding. Indeed, these documents could not be considered "information within the government's control" as that phrase is used in *Houchins*. *Id.* at 15, 98 S.Ct. 2588.

Although the public's right of access to judicial documents under the common law and the First Amendment "are not coterminous, courts have employed much the same type of screen in evaluating their applicability to particular claims." *Providence Journal*, 293 F.3d at 10. However, there are important differences between the two rights of access:

> The distinction between the rights afforded by the first amendment and those afforded by the common law is significant. A first amendment right of access can be denied only by proof of a "compelling governmental interest" and proof that the denial is "narrowly tailored to serve that interest." *Globe Newspaper [Co. v.Super. Ct.]*, 457 U.S. [596], 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 [ (1982) ]. In contrast, under the common law the decision to grant or deny access is "left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 599, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).

*Baltimore Sun*, 886 F.2d at 64. Accordingly, I proceed to evaluate the scope of the public right of access to the Connolly judicial documents under both the common law and the First Amendment.

B. *The Presumption of Public Access Under the Common Law*

The determination that particular documents are "judicial" documents ipso facto establishes a presumptive right of public access under the common law: "Courts long have recognized that public monitoring of the judicial system fosters the important values of quality, honesty

and respect for our legal system. This recognition has given rise to a presumption that the public has a common-law right of access to judicial documents." *Providence Journal*, 293 F.3d at 9 (internal citations omitted). "This presumptive right of access attaches to those materials 'which properly come before the court in the course of an adjudicatory proceeding and which are relevant to that adjudication.'" *Id.* (quoting *Standard Financial*, 830 F.2d at 412–13 (1st Cir.1987)). However, not all presumptions of access are created equal:

> We believe that the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

*Amodeo II*, 71 F.3d at 1049. Here, the CJA Form 23 information unmistakably falls on the "strong presumption" end of the Article III continuum. While the judge conducting the eligibility inquiry has the discretion to consider other factors, such as the nature of the proceeding for which the defendant seeks appointed counsel, the applicant's financial status is, for obvious reasons, of the utmost importance to the court. In many cases, the financial documents may be the only evidence submitted in the eligibility proceeding, a consideration that significantly strengthens the common law presumption of access: "Judicial records are presumptively subject to public inspection.... [T]he presumption is at its strongest when the document in question, as here, has been submitted as a basis for judicial decision making." *Greater Miami Baseball*

*Club Ltd. v. Selig*, 955 F.Supp. 37, 39 (S.D.N.Y.1997) (citing *Joy v. North*, 692 F.2d 880, 893 (2d Cir.1982)).

While the caselaw supports the recognition of a common law presumption of access to Connolly's eligibility forms, the magistrate judge stated in his decision that "the [CJA] statute and regulations ... supercede the common law right if one existed." (citing *Gonzales*, 150 F.3d at 1263). That sweeping assertion must be measured against familiar standards. In *United States v. Texas*, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), the Supreme Court recognized the

> longstanding ... principle that "statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." In such cases, Congress does not write upon a clean slate. In order to abrogate a common-law principle, the statute must "speak directly" to the question addressed by the common law.

*Id.* at 529, 113 S.Ct. 1631 (internal citations omitted). Accordingly, under well-settled principles of statutory construction, courts will not construe a statute as derogative of the common law unless Congress explicitly articulates that intent:

> The courts have consistently held legislation derogative of the common law accountable to an exactness of expression, and have not allowed the effects of such legislation to be extended beyond the necessary and unavoidable meaning of its terms. The presumption runs against such innovation. This is merely a familiar principle of statutory construction.

*Scharfeld v. Richardson*, 133 F.2d 340, 341 (D.C.Cir.1942).

The language of the CJA reflects Congress's sensitivity to these background principles. Where Congress identified a need to preserve confidentiality during the CJA appointment process, it expressly did so through statutory provisions narrowly addressed to particular documents and proceedings. *See* 18 U.S.C. § 3006A(d)(4) (directing courts to delay or limit the disclosure of payment information where doing so would undermine *inter alia* the defendant's constitutional rights, the attorney-client privilege, or the work product privilege); 18 U.S.C. § 3006A(e) (authorizing courts to approve payment for "investigative, expert, or other services necessary for adequate representation .... [u]pon finding, after appropriate inquiry *in an ex parte proceeding*, that the services are necessary and that the person is financially unable to obtain them") (emphasis added).[10]

By contrast, neither the statute nor the *A.O. Guide* refers specifically to the confidentiality or disclosure of CJA Form 23 information, which ordinarily does not implicate a defendant's Fifth Amendment rights.[11] Instead, the implementing regulations promulgated by the Administrative Office of U.S. Courts establish a general presumption of disclosure that encompasses the CJA processes and documents that do not receive individualized treatment in the statute itself:

> Generally, such information [pertaining to activities under the Criminal Justice Act and related statutes] which is not otherwise routinely available to the public should be made available unless it is judicially placed under seal, or could reasonably be expected to *unduly intrude upon* the privacy of attorneys or defendants; compromise defense strategies, investigative procedures, attorney work product, the attorney-client relationship or privileged information provided by the defendant or other sources; or otherwise adversely affect the defendant's right to the effective assistance of counsel, a fair trial, or an impartial adjudication.

*A.O. Guide* § 5.01(A) (emphasis added). This provision of the guidelines, which controls where Congress does not bar the disclosure of particular CJA materials with an "exactness of expression," *see Scharfeld*, 133 F.2d at 341, is essentially a regulatory codification of the balancing exercise that courts employ once a qualified public right of access has attached to judicial documents under the common law. *Compare Amodeo II*, 71 F.3d at 1050–51, *with* VII *A.O. Guide* § 5.01(A). By specifying that CJA materials should be released unless the materials "*unduly* intrude upon

---

**10.** The substance of 18 U.S.C. § 3006A(d)(4) underscores why *Gonzalez* is poor authority for the magistrate judge's assertion that the CJA preempts the application of common law principles to the Form 23 affidavits. Not only does *Gonzales* cite no authority for the proposition that Congress intended the CJA statute and regulations to "occupy [the] field and ... supercede the common law right [of public access]," *Gonzales*, 150 F.3d at 1263, but the court in *Gonzales* was adjudicating a local newspaper's petition to unseal CJA payment vouchers and reimbursement documentation, materials whose disclosure is discussed specifically and at great length in 18 U.S.C. 3006A(d)(4). Congress's extended treatment of these materials reflects the unique dangers attending the premature disclosure of this information, which could potentially "reveal the strengths and weaknesses of a defendant's case and his or her trial strategy, including possible defenses, witnesses, and evidence to be used at trial." *Id.* at 1259.

**11.** Indeed, at least one court has found that "[t]he CJA does not mandate nor seemingly contemplate a closed presentation of financial information. Ex parte proceedings are not consistent with traditional adversarial proceedings." *Coniam*, 574 F.Supp. at 617 n. 2.

the privacy of attorneys or defendants," *A.O. Guide* § 5.01(A) (emphasis added), the regulations signal judges that the magnitude of the intrusion must be weighed against the benefits of public disclosure. Accordingly, the law and the guidelines appear not to preempt, but rather to ratify, a common law presumption of access to the information at issue here.

## C. *The Public Right of Access Under the First Amendment*

In *Press–Enterprise v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II* ), the Supreme Court articulated the test for determining when a First Amendment right of public access attaches to judicial documents:

> In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a "tradition of accessibility implies the favorable judgment of experiences," we have considered whether the place and process have historically been open to the press and general public [the "experience" prong].
>
> . . . .
>
> Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in

the functioning of the particular process in question [the "logic" prong].

*Press–Enterprise II*, 478 U.S. at 8–9, 106 S.Ct. 2735 (internal quotation marks omitted).[12] While Connolly contends that both prongs of this standard must be satisfied for a qualified First Amendment right of public access to attach, at least two courts have recognized a qualified First Amendment right to CJA materials on the strength of the "logic" prong alone. *See United States v. Suarez*, 880 F.2d 626, 631 (2d Cir.1989); *United States v. Ellis*, 154 F.R.D. 692, 696 (M.D.Fl.1993). As the Second Circuit observed in *Suarez:*

> It is true that there is no long "tradition of accessibility" to CJA forms. However, that is because the CJA itself is, in terms of "tradition," a fairly recent development, having been enacted in 1964. . . . The lack of "tradition" with respect to the CJA forms does not detract from the public's strong interest in how its funds are being spent in the administration of criminal justice and what amounts of public funds are paid to particular private attorneys or firms.

*Suarez*, 880 F.2d at 631. This lack of tradition for criminal proceedings of recent origin places intervenors like the Boston Herald in the awkward position of analogizing the documents or proceedings at

12. While the Sixth Amendment grants criminal defendants "the right to a speedy and *public* trial," this amendment is not the source of the constitutional right of public access to Connolly's financial affidavits urged by the Boston Herald. In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the Supreme Court established that the public's right of access to criminal proceedings is rooted in the First Amendment:

> In guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees ... [T]he First

Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted.

*Id.* at 575–76, 100 S.Ct. 2814. For this reason, criminal defendants cannot foreclose public access to their trials and the documents submitted therein simply by waiving their Sixth Amendment right to a public trial: "While the Sixth Amendment guarantees to a defendant in a criminal case the right to a public trial, it does not guarantee the right to compel a private trial." *Gannett Co. v. DePasquale*, 443 U.S. 368, 382, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

issue to materials or proceedings with traditions of accessibility. Such analogies can be useful but not decisive. They are inevitably assailable on grounds that the comparison is imperfect, or that application of the tradition would prove too much. In the end there is no sound reason to exclude criminal proceedings of recent origin from the reach of the First Amendment simply because they cannot match the lineage of proceedings that have long been part of the criminal process. *Press–Enterprise II*, 478 U.S. at 8, 106 S.Ct. 2735.

In explaining the logic prong, the Supreme Court has recognized that the right of access to judicial proceedings

> plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access ... fosters an appearance of fairness, thereby heightening respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government.

*Globe Newspaper*, 457 U.S. at 606, 102 S.Ct. 2613. In *United States v. Suarez*, 880 F.2d 626 (2d Cir.1989), the Second Circuit determined that the benefits of public scrutiny outlined in *Globe Newspaper* apply with equal force to the CJA appointment process:

> Because there is no persuasive reason to ignore the presumption of openness that applies to documents submitted in connection with a criminal proceeding, we conclude that the public has a qualified First Amendment right of access to the CJA forms after payment has been approved.

*Id.* at 631.[13]

As I read the precedents, the Supreme Court did not intend the logic prong to limit the reach of the First Amendment only to those judicial processes that would realize efficiency and accuracy gains in the "sunshine" of public access. On the contrary, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and its progeny, *see Press–Enterprise I*, 464 U.S. at 505, 104 S.Ct. 819; *Globe Newspaper*, 457 U.S. at 606, 102 S.Ct. 2613, suggest that the benefits accruing to society from a right of public access to judicial documents and proceedings are assumed prima facie under the logic prong. Accordingly, as the language of *Press Enterprise II* suggests, satisfaction of the logic prong turns on the narrower question of whether public disclosure would defeat the purpose of the specific judicial process at issue:

> Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question. Although many government processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly. A classic example is that "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."

---

**13.** In *Suarez*, the intervenors only petitioned for access to attorney payment information, and did not seek to unseal the defendant's financial affidavits. Nonetheless, the Second Circuit's observation that the oft-recognized benefits from public monitoring of criminal trials are also realized in the CJA context has important implications for this case as well.

*Press–Enterprise II,* 478 U.S. at 8–9, 106 S.Ct. 2735 (quoting *Douglas Oil Co. v. Petrol Stops N.W.,* 441 U.S. 211, 218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)). The Ninth Circuit echoed this theme in *Times Mirror Co. v. United States,* 873 F.2d 1210 (9th Cir.1989):

> Every judicial proceeding, indeed every governmental process, arguably benefits from public scrutiny to some degree, in that openness leads to a better-informed citizenry and tends to deter government officials from abusing the powers of government.... Certainly, the public's interest in self-governance and prevention of abuse of official power would be served to some degree if grand jury proceedings were opened. The same might be said of jury deliberations and the internal communications of this court. But because the integrity and independence of these proceedings are threatened by public disclosures, claims of "improved self-governance" and "the promotion of fairness" cannot be used as an incantation to open these proceedings to the public.

*Id.* at 1213 (internal citations omitted).

The nature and degree of "procedural frustration" required to remove a class of judicial documents submitted in a criminal case from First Amendment scrutiny has been well documented by courts adjudicating petitions to publicly disclose the presentence reports of convicted defendants. As the jurisprudence in this area illustrates, the three primary parties to every criminal proceeding—the defendant, the government and the judge—have differing interests in maintaining the confidentiality of certain judicial documents. The defendant's interest is often privacy-based, as noted in the context of presentence reports: "The criminal defendant has a strong interest in maintaining the confidentiality of his or her presentence report

... the presentence investigation often involves a broad-ranging inquiry into a defendant's private life, not limited by traditional rules of evidence." *United States v. Corbitt,* 879 F.2d 224, 230 (7th Cir.1989).

Confidentiality serves a different function for courts. The accuracy and fairness of judicial determinations depends in large part on the informative value of the judicial documents submitted to the court. To the extent that public disclosure of presentence reports would create disincentives for the defendant, the government or independent third parties to provide information that would aid the court's determination, recognizing a public right of access under the First Amendment could undermine the sentencing process. As the Seventh Circuit observed: "[R]equiring disclosure of a presentence report is contrary to the public interest as it would adversely affect the sentencing court's ability to obtain data on a confidential basis from the accused and from sources independent of the accused for use in the sentencing process." *United States v. Greathouse,* 484 F.2d 805, 807 (7th Cir.1973).

Finally, the government may ask courts to seal documents that contain information about confidential informants, reveal the strategies employed by the police to apprehend criminals, or otherwise undermine law enforcement objectives. In *Corbitt,* the Seventh Circuit enumerated the government's interests in maintaining the confidentiality of presentence reports:

> The presentence report will often contain information regarding the defendant's past or future cooperation with the government. The report may also include information conveyed by informants or cooperating codefendants regarding the defendant's relative culpability for the offense for which he has been convicted, and the defendant's involvement in other crimes which may be

under investigation. Especially where the defendant was a member of an organized, ongoing criminal enterprise, disclosure may pose a substantial risk of retaliation against the defendant.... Therefore widespread disclosure of the presentence report may obstruct the government's ability to investigate crimes.

*Corbitt,* 879 F.2d at 235. *In toto,* these misgivings mirror the concerns that led courts to shield grand jury proceedings from public access, *id.* at 232 n. 8 (listing cases), and have since been echoed by other courts declining to recognize a constitutional right of access to presentence reports. *See United States v. Huckaby,* 43 F.3d 135, 138 (5th Cir.1995); *United States v. Schlette,* 842 F.2d 1574, 1579–81 (9th Cir.1988).

Of all the ills associated with the disclosure of presentence reports, only the defendant's interest in privacy is implicated by the disclosure of CJA financial affidavits. Unlike the process of developing presentence reports, where the court must cast a wide net to retrieve important information from multiple sources, the CJA eligibility inquiry relies primarily on the defendant to provide the critical informa-

tion. Accordingly, the public disclosure of CJA eligibility information would not stifle a flow of information from diverse sources, as it might in the presentence report context. Similarly, because the CJA Form 23 is concerned solely with the applicant's financial status, and does not provide a medium for exposing government informants or revealing other sensitive law enforcement secrets, the government has no vested interest in ensuring the confidentiality of these financial affidavits.

Nonetheless, the majority posits that the CJA appointment process is uniquely susceptible to privacy-based "frustration," reasoning that prospective CJA applicants will be deterred from seeking court-appointed counsel by the prospect that their financial affidavits will be publicly disclosed. However, indigent criminal defendants facing hefty fines, long incarceration, or both are unlikely to forego the opportunity to seek court-appointed counsel out of concern for the confidentiality of their financial information.[14] In the absence of any discernible court or government interest in the confidentiality of CJA eligibility information, the majority's holding that an intrusion into the defendant's privacy, without more, "totally frustrates" a judicial

---

14. The majority argues that this reality unfairly imposes a "Hobson's choice" on indigent criminal defendants, and cites our decision in *Holden v. United States,* 393 F.2d 276 (1st Cir.1968) for the proposition that "defendants are not to be avoidably discriminated against because of their indigency." *Id.* at 278. The "avoidable discrimination" we confronted in *Holden* implicated the right of the defendant to mount an effective defense unburdened by the disclosure of information that financially self-sufficient defendants would not be required to submit. We ruled that Holden was entitled to exclude the government from the required *ex parte* proceeding for indigent defendants seeking a subpoena under Federal Rule of Criminal Procedure 17(b). *Id.* The language of the CJA reflects Congress's sensitivity to this same principle of protecting the

indigent defendant from disclosures that would compromise the ability to mount an effective defense. *See* 18 U.S.C. § 3006A(d)(4) (directing courts to delay or limit the disclosure of payment information to avoid undermining the defendant's trial strategy); 18 U.S.C. § 3006A(e) (granting defendants an *ex parte* forum to request reimbursement for supplemental services). Beyond these specific areas, the broad presumption of disclosure articulated in the *A.O. Guide* indicates that, in the face of a substantial public interest in the CJA appointment process, indigent defendants using court appointed counsel will be subject to disclosure requirements relating to their program eligibility and the compensation of their attorneys that do not apply to defendants with privately retained counsel.

proceeding, see *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. 2735, expands unjustifiably the range of judicial documents and procedures integral to the criminal process but shielded from First Amendment scrutiny.[15] In my view, Connolly's privacy concerns do not defeat the logic prong of *Press–Enterprise II,* and a qualified First Amendment right of access attaches to the financial affidavits.[16]

## II.

The majority states in the alternative that "[e]ven assuming that CJA eligibility documents were covered by a common law presumption of access, we should still affirm the magistrate judge's decision to maintain the sealing of Connolly's CJA application materials." In support of this position, the majority cites our decision in *Siedle v. Putnam Invs. Inc.,* 147 F.3d 7 (1st Cir.1998), for the proposition that "[t]he trial court enjoys considerable leeway in making decisions of this sort." *Id.* at 10. Yet in *Siedle,* we stressed that these sealing determinations are only entitled to deference if they reflect a careful balancing of the competing interests at stake:

> [W]hen a party requests a seal order, or, as in this case, objects to an unsealing order, a court must carefully balance the competing interests that are at stake in

the particular case ... The trial court enjoys considerable leeway in making decisions of this sort. Thus, *once the trial court has struck the balance,* an appellate court will review its determinations only for mistake of law or abuse of discretion.

*Id.* at 10 (emphasis added).

Respectfully, I do not believe that the magistrate judge carefully balanced the competing interests in this case. The judge expressly determined that "the Boston Herald has no First Amendment or federal common law right of access to the documents," and summarily concluded that "the intrusion on the privacy of the defendant and that of his family if the documents were released would be as substantial now as it was when the sealing orders were entered." By declining to even acknowledge a common law presumption of access, the magistrate judge excluded any competing public interests from the decisional calculus, and denied the Boston Herald the rigorous balancing determination it is entitled to once the common law right attaches. *See Providence Journal,* 293 F.3d at 11 ("[O]nly the most compelling reasons can justify non-disclosure of judicial records that come within the scope of the common-law right of access.").

---

**15.** Thus far, this category is limited to grand jury proceedings, see *Press Enterprise II,* 478 U.S. at 9, 106 S.Ct. 2735, jury deliberations, see *Times Mirror,* 873 F.2d at 1213, internal court communications, see *id.,* and presentence reports, see *Corbitt,* 879 F.2d at 224.

**16.** The majority states that "[c]onstitutionalizing the access question ... displaces the policy established by Congress and the courts," and has the effect of "render[ing] the entire discretion-based framework in the A.O. Guide unconstitutional." To the contrary, recognizing a qualified First Amendment right of access constrains, within the CJA framework, the discretion of judges who are asked to seal

documents. The caselaw is replete with instances in which courts have required that a statute be applied in a manner that will avoid a First Amendment conflict. *See, e.g., United States v. Three Juveniles,* 61 F.3d 86 (1st Cir. 1995) (adopting a narrowing construction of the Federal Juvenile Delinquency Act); *McDonnell Douglas, Pulitzer Publishing Co.,* 855 F.2d 569 (8th Cir.1988) (construing the Federal Wiretapping Statute as requiring judges to conduct a First Amendment balancing exercise to determine whether intercepted conversations included in court documents should be publicly disclosed).

As *Providence Journal* suggests, application of the common law presumption of access imposes a heavy burden on the party seeking to seal judicial documents. Indeed, applying the common law standard, courts have unsealed portions of judicial documents containing arguably more sensitive information than the financial data required by the CJA Form 23 affidavit. In *United States v. Kaczynski*, 154 F.3d 930 (9th Cir.1998), the Ninth Circuit upheld the district court's decision to unseal redacted portions of Theodore Kaczynski's psychiatric competency report after he entered a guilty plea in the notorious "Unabomber" case: "In balancing the competing interests of the parties, the district court did not abuse its discretion. It determined that, as to the unredacted part of the report, the media's need for disclosure outweighed Kaczynski's privacy interests." *Id.* at 932. Similarly, in *United States v. Huckaby*, 43 F.3d 135 (5th Cir.1995), the Fifth Circuit, after acknowledging that "[t]he ordinary confidentiality of presentence reports is supported by powerful policy considerations," upheld the trial court's disclosure of defendant's pre-sentence report after his conviction for tax evasion. *Id.* at 138–140. The "lengthy" report reflected an exhaustive accounting of defendant's financial records, and concluded that Huckaby had failed to file state and federal income tax returns for both himself and his business. *Id.* The court agreed with the district judge that the strong public interest in the presentence report warranted disclosure:

> The court hoped that the release of the [presentence report] would explain the basis of Huckaby's prosecution so as to eliminate any shadow of doubt that this proceeding was racially motivated. Rather than allow bitterness to fester within the community as a result of Huckaby's guilty plea and sentence, the court decided to juxtapose against the rhetoric on Huckaby's behalf the seamy reality of his tax avoidance.

*Id.* at 140–41. We have also upheld the release of court documents containing personal financial information similar to the materials at issue here after balancing the public interest under the common law. *See Standard Financial*, 830 F.2d at 404.

CJA Form 23 financial information may present less weighty privacy concerns than psychiatric evaluations or pre-sentence reports. Moreover, since the government may theoretically challenge a judge's decision to appoint counsel in every case, *see, e.g., Harris*, 707 F.2d at 660–62; *Hickey*, 997 F.Supp. at 1207, applicants cannot argue that they have a legitimate expectation of privacy in the CJA financial information, entitling them to protect their financial status from public disclosure throughout the eligibility process. To be sure, the privacy concerns of CJA applicants should be accorded their due weight by the judge. So too should the concerns of third parties whose financial ties to the defendant may expose them to unwarranted disclosures. But these concerns can be effectively addressed by narrowly tailored redactions of the financial affidavits. They do not justify giving short shrift to the public's competing interest in order to prohibit disclosure entirely. At best, the magistrate judge gave inadequate consideration to the public's interest in Connolly's financial affidavits; the record more strongly suggests that the public interest received no consideration at all. Therefore, I cannot agree with the decision to defer to the magistrate judge's exercise of discretion, even on the majority's assumption of a common law presumption of access to the financial affidavits.

### III.

The CJA eligibility forms at issue bear every hallmark of judicial documents: 1)

the eligibility proceeding potentially occurs within an adversarial setting, 2) the judge plays a critical role in the outcome, 3) the court relies heavily on the financial affidavits to reach its decision, and 4) the outcome of the proceeding is a substantive determination of the applicant's Sixth Amendment right to counsel. These considerations alone suffice to establish a common law presumption of access to the eligibility forms. Because CJA financial affidavits do not fall within the narrow category of judicial documents whose disclosure would frustrate the corresponding criminal judicial process, a First Amendment right of access attaches to these documents as well.

Under well-established precedent, a defendant's privacy interests alone cannot preclude the attachment of a public right of access to judicial documents in the first instance. In the absence of this right of access, judges have nearly unlimited discretion to shield CJA form 23 affidavits from public disclosure. Judges exercising this discretion will rarely, if ever, reject an applicant's privacy interest in personal financial information to vindicate a public interest unbacked by the common law or the First Amendment.

I do not minimize the importance of the CJA applicants' privacy interests in this financial information. These interests deserve careful consideration in the context of a constitutional balancing analysis. There was no such analysis here. Therefore, I respectfully disagree with the majority's decision to affirm. Instead, I would remand this case to the district court with instructions to conduct the proper balancing analysis.

## FINANCIAL AFFIDAVIT

CJA 23

IN SUPPORT OF REQUEST FOR ATTORNEY, EXPERT OR OTHER COURT SERVICES WITHOUT PAYMENT OF FEE

REV. 5/98

| IN UNITED STATES IN THE CASE OF | ☐ MAGISTRATE ☐ DISTRICT ☐ APPEALS COURT or ☐ OTHER PANEL (Specify below) | | LOCATION NUMBER |
|---|---|---|---|

|_____ VS. _____| FOR | ► |
| | AT | |

PERSON REPRESENTED (Show your full name)

**DOCKET NUMBERS**
Magistrate

District Court

Court of Appeals

1 ☐ Defendant—Adult
2 ☐ Defendant—Juvenile
3 ☐ Appellant
4 ☐ Probation Violator
5 ☐ Parole Violator
6 ☐ Habeas Petitioner
7 ☐ 2255 Petitioner
8 ☐ Material Witness
9 ☐ Other (Specify)

CHARGE/OFFENSE (describe if applicable & check box → )  ☐ Felony  ☐ Misdemeanor

### ANSWERS TO QUESTIONS REGARDING ABILITY TO PAY

**ASSETS**

**EMPLOYMENT**

Are you now employed? ☐ Yes ☐ No ☐ Am Self Employed

Name and address of employer: _____

IF YES, how much do you earn per month? $_____

IF NO, give month and year of last employment
How much did you earn per month $_____

If married is your Spouse employed? ☐ Yes ☐ No
IF YES, how much does your Spouse earn per month? $_____
If a minor under age 21, what is your Parents or Guardian's approximate monthly income $_____

**OTHER INCOME**

Have you received within the past 12 months any income from a business, profession or other form of self-employment, or in the form of rent payments, interest, dividends, retirement or annuity payments, or other sources? ☐ Yes ☐ No

IF YES, GIVE THE AMOUNT RECEIVED & IDENTIFY THE SOURCES

RECEIVED L_____J  SOURCES _____
L_____J _____
L_____J _____

**CASH**

Have you any cash on hand or money in savings or checking account ☐ Yes ☐ No  IF YES, state total amount $_____

**PROPERTY**

Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding ordinary household furnishings and clothing)? ☐ Yes ☐ No

IF YES, GIVE VALUE AND DESCRIBE IT

VALUE  DESCRIPTION
$ L_____J _____
L_____J _____
L_____J _____
L_____J _____

**OBLIGATIONS & DEBTS**

**DEPENDENTS**

MARITAL STATUS
☐ SINGLE
☐ MARRIED
☐ WIDOWED
☐ SEPARATED OR DIVORCED

Total No. of Dependents

List persons you actually support and your relationship to them
_____
_____
_____
_____

**DEBTS & MONTHLY BILLS**
(LIST ALL CREDITORS, INCLUDING BANKS, LOAN COMPANIES, CHARGE ACCOUNTS, ETC.)

| APARTMENT OR HOME: | Creditors | Total Debt | Monthly Payt. |
|---|---|---|---|
| | | $_____ | $_____ |
| | | $_____ | $_____ |
| | | $_____ | $_____ |
| | | $_____ | $_____ |

I certify under penalty of perjury that the foregoing is true and correct. Executed on (date) _____

SIGNATURE OF DEFENDANT ► _____
(OR PERSON REPRESENTED)